William H. HORNBOSTEL,
Appellant–Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 82A01–0103–CR–92.

Court of Appeals of Indiana.

Oct. 19, 2001.

Jon Aarstad, Vanderburgh County Public Defender Agency, Evansville, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Cynthia L. Ploughe, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

RILEY, Judge.

### STATEMENT OF THE CASE

Appellant Defendant, William Hornbostel (Hornbostel), appeals his conviction for murder, a felony, Ind.Code § 35–42–1–1(1). Additionally, Hornbostel appeals his habitual offender enhancement, Ind.Code § 35–50–2–8. Hornbostel also appeals his sentence.

We affirm.

## ISSUES

Hornbostel raises twelve issues on appeal, which we consolidate and restate as follows:

1. Whether he was properly adjudged an habitual offender.

2. Whether the trial court properly instructed the jury that voluntary intoxication is not a defense.

3. Whether the State presented sufficient evidence to support his conviction for murder.

4. Whether the State failed to rebut his prima facie showing that he killed Sneed while in a state of sudden heat.

5. Whether the trial court erred in admitting certain evidence over his objection.

6. Whether he was properly sentenced.

## FACTS AND PROCEDURAL HISTORY

During the early morning hours of August 26, 2000, Hornbostel met the victim, Andrew Sneed (Sneed), at Someplace Else, a gay bar in Evansville, Indiana. That morning, Hornbostel went home with Sneed. Hornbostel testified that he went to Sneed's apartment, because he needed a place to sleep and Sneed offered to let him sleep at his apartment. Hornbostel testified that he is not gay.

According to Hornbostel, Sneed made sexual advances toward him while he was trying to sleep. Apparently, after thwarting off Sneed's sexual advances, Hornbostel "freaked out." (R. 283). Hornbostel wrestled with Sneed and, at some point, put his hands around Sneed's neck and choked him to death. After strangling him, Hornbostel took some of Sneed's electronic equipment and his vehicle. Hornbostel sold, at least, two VCRs that he took from Sneed's apartment.

Later that morning, Hornbostel was involved in a car accident in Providence, Kentucky. He was arrested for driving under the influence of alcohol. After some investigation as to the ownership of the vehicle that Hornbostel was driving, the Evansville police were asked to check on Sneed's welfare. Police officers found Sneed's nude dead body in a partly closed hide-a-bed in his apartment.

On August 28, 2000, the State filed an information against Hornbostel, charging him with murder. On August 31, 2000, the State filed an additional information, charging Hornbostel with theft, a Class D felony, Ind.Code § 35–43–4–2, and auto theft, a Class D felony, Ind.Code § 35–43–4–2.5. The State also filed an information, alleging that Hornbostel was an habitual offender. At an evidentiary hearing on November 27, 2000, Hornbostel objected to the habitual offender information. On November 30, 2000, the trial court issued an Order that overruled Hornbostel's objection to the filing of the habitual offender information.

On December 11, 2000, the State filed an amended information as to Count II, theft. The information alleged that Hornbostel took electronic equipment of Sneed's, whereas the original Count II alleged that Hornbostel took two VCRs belonging to Sneed.

On December 11–12, 2000, a jury trial was held. At trial, Hornbostel objected to, among other things, the admission of an autopsy photograph of Sneed. The picture was a close-up of Sneed's bloodshot eyeball with his eyelids held apart by surgical instruments. The trial court overruled the objection and admitted the photograph. Also at trial, Detective Jeffrey Hands (Hands) testified. Hands, being the lead detective, took statements from Hornbostel on, at least, two different occasions. On redirect examination, Hands was asked "[d]id you believe Mr. Hornbostel when he said he didn't intend to kill Jeffrey Sneed,

Andrew Sneed?" (R. 160). Hornbostel objected, stating that the question "invades the province of the jury." (R. 161). The trial court overruled the objection and allowed Hands to answer the question.

Prior to its deliberation, the trial court gave the jury its Final Instructions. Court's Instruction No. 22 informed the jury that:

It is a defense that the person who engaged in the prohibited conduct did so while he was intoxicated, only if the intoxication resulted from the introduction of a substance into his body:

1. [W]ithout his consent; or

2. When he did not know that the substance might cause intoxication.

(Appellant's Appendix 100). Hornbostel objected to this instruction. His objection was overruled and the trial court gave the instruction.

On December 12, 2000, the jury found Hornbostel guilty of murder, theft, and auto theft. After finding Hornbostel guilty as charged on all counts, the jury was offered its choice of having the habitual offender proceeding conducted that evening or the next morning. The jury decided to hear the evidence on the habitual offender enhancement that evening.

At the hearing on the habitual offender enhancement, it was revealed that, on two separate and unrelated occasions, Hornbostel committed grand theft in the third degree, FLA. STAT. ANN. § 812.014(2)(c)(1), and delivery of cocaine, FLA. STAT. ANN. § 893.13(1)(a)(1). These offenses occurred in Orange County, Florida. Hornbostel pled guilty to grand theft in the third degree and pled *nolo contendere* to delivery of cocaine.

State's exhibits demonstrated that these offenses are considered felonies in Florida. Though the State's exhibits, which included charging affidavits, charging informa-

tions, judgments of the trial court, docket information and sentencing information for both offenses, established that these offenses are felonies in Florida, Hornbostel's counsel moved for judgment on the evidence, maintaining that "[t]here's been no showing that the convictions resulted in what would be considered a felony in the State of Indiana." (R. 436). Hornbostel's counsel also objected to the trial court's Habitual Offender Instruction No. 5, which stated:

You are instructed that the offenses of Delivery of Cocaine and Grand Theft Larceny in the Third Degree are felonies as the term is defined by Indiana law.

(Appellant's Appendix at 111). Hornbostel's counsel argued that:

I believe that the proper way of proving this, that they would be felonies is to (inaudible), would be to bring in a Florida expert whether it be an attorney or otherwise to discuss the possible penalties of each.

(R. 439). Hornbostel's motion for judgment on the evidence was denied, and his objection to Habitual Offender Instruction No. 5 was overruled. After deliberating for approximately ten minutes, the jury found Hornbostel to be an habitual offender.

On January 25, 2001, a sentencing hearing was held. The trial court found as follows:

[Ind.Code § 35–38–1–7.1] Section B sets out the aggravating circumstances and the Court finds the following aggravating circumstances exist in addition to the matters that I was required to consider under Section A. Pursuant to B(1) the Court finds that the defendant has recently violated the terms of probation or parole. The Pre–Sentence reflects a variety of sentences given to the defen-

dant that indicated treatment plans. Many of these sentences were violated and warrants were issued because of his non-compliance with those treatment plans. (2), the aggravating circumstance that the person has a history of criminal or delinquent activity. That is established by the Pre–Sentence Report. (3), the defendant is in need of correctional or rehabilitative treatment that can best be provided by his commitment to a penal facility. I believe in this case the evidence is that that could be established only by his commitment to a penal facility. (4), this is not an aggravating circumstance but it is a reason for not reducing the sentence below the standard certainly and that is the imposition of a reduced sentence would reduce the seriousness of the crime charged. Those aggravating circumstances are all established by the evidence. The Court is required, pursuant to Section C of the statute, to consider possible mitigating circumstances and I have reviewed each of the items listed there. Specifically I considered whether or not item 3, the victim induced or facilitated the offense and the item 5, whether the victim or whether Mr. Hornbostel, you were acting under strong provocation and after considering those items I find the evidence did not warrant a conclusion that either of those mitigating circumstances exist. None of the other circumstances are warranted or established by the evidence either so there are no mitigating circumstances in this case.

(R. 457–459).

The trial court sentenced Hornbostel to sixty (60) years on Count I, murder, enhanced by thirty years, calling for a ninety (90) year executed sentence on Count I. Hornbostel was also sentenced to three (3) years on Count II, theft, and to three (3) years on Count III, auto theft. All counts

to be served consecutively for a total sentence of ninety-six (96) years.

Hornbostel now appeals.

## DISCUSSION AND DECISION

### I. *Habitual Offender*

Hornbostel argues that he was improperly adjudged an habitual offender. Specifically, Hornbostel argues that there was insufficient evidence that his Florida convictions were felonies. Furthermore, Hornbostel argues that it was fundamental error to conduct the habitual offender proceeding so late in the day that the jury would rush to complete its deliberations, which only took ten minutes.

In order for an individual to be found an habitual offender pursuant to Ind.Code § 35–50–2–8, the State must prove, beyond a reasonable doubt, that the individual has accumulated two prior unrelated felony convictions. This requires the State to produce evidence that the individual "has been convicted and sentenced for a felony committed after sentencing for a prior unrelated felony conviction." Ind.Code § 35–50–2–8(b).

■ It is undisputed that Hornbostel's Florida convictions qualify as prior and unrelated; however, Hornbostel maintains that there is insufficient proof that his Florida convictions are felonies. We disagree. The State entered into evidence the charging affidavits for both convictions. Each charging affidavit indicates that Hornbostel was being charged with a felony. The State also entered into evidence Hornbostel's guilty plea for grand theft in the third degree and his plea of *nolo contendere* to delivery of cocaine. These documents show that Hornbostel was convicted under FLA. STAT. ANN. § 812.014(2)(c)(1) and FLA. STAT. ANN. § 893.13(1)(a)(1). FLA. STAT. ANN. § 812.014(2)(c)(1) provides that grand theft

in the third degree is a felony. FLA. STAT. ANN. § 893.13(1)(a)(1) provides that delivery of cocaine is a felony.

Ind.Code § 34–38–4–1 provides that "[e]very court in Indiana shall take judicial notice of the common law and statutes of every state, territory, and other jurisdiction of the United States." Furthermore, Ind.Code § 34–38–4–3 provides that "[t]he determination of these laws shall be made by the court and not by the jury, and is reviewable."

■ Accordingly, we find that the State provided the trial court with sufficient evidence to prove that Hornbostel's Florida convictions were felonies. We also find that the trial court appropriately took judicial notice of Florida's statutory laws and instructed the jury that the offenses of delivery of cocaine and grand theft in the third degree are felonies, as this was not a determination for the jury.[1]

Next, Hornbostel argues that it was fundamental error to conduct the habitual offender proceeding so late in the day that the jury would rush to complete its deliberations, which took only ten minutes. We disagree.

■ At the outset, we must note that Hornbostel did not object to proceeding with the habitual offender phase. The fail-ure to object at trial results in waiver of the issue on appeal. *Mitchell v. State*, 726 N.E.2d 1228, 1235 (Ind.2000), *reh'g denied.* To avoid waiver, Hornbostel claims fundamental error.

The fundamental error exception is extremely narrow. To qualify as fundamental error, "an error must be so prejudicial to the rights of the defendant as to make a fair trial impossible." *Willey v. State*, 712 N.E.2d 434, 444–45 (Ind. 1999) (citations omitted). To be fundamental error, the error "must constitute a blatant violation of basic principles, the harm or potential for harm must be substantial, and the resulting error must deny the defendant fundamental due process." *Wilson v. State*, 514 N.E.2d 282, 284 (Ind.1987).

*Id.* at 1236.

■ Hornbostel has not demonstrated fundamental error. After the jury returned its verdict of guilty on all counts, the trial court gave the jury the option of proceeding with the habitual offender phase that same day or returning the next day. The jury chose to stay and proceed with the habitual offender phase. As previously stated, it was undisputed that Hornbostel's Florida convictions were prior and unrelated. Though disputed, the

---

1. We note that Hornbostel argues that Ind. Code § 34–38–4–1 & § 34–38–4–3 are unconstitutional as applied to criminal proceedings and habitual offender determinations. We disagree. These code sections do not state that they apply only to civil proceedings. Moreover, when we take judicial notice of statutes from another state, we do so out of respect for that state's laws. We recognize that each state has the right to structure its laws as it deems appropriate. We accept that and find that it is appropriate to take judicial notice of such statutes. Additionally, Hornbostel argues that *Cavendish v. State*, 496 N.E.2d 46 (Ind.1986), establishes that the trial court erred in finding that the State provided sufficient evidence to sustain his habitual of-fender finding. We disagree. In *Cavendish,* our supreme court found that "[i]f it is proper for the court to instruct the jury in a habitual hearing that a prior judgment is a felony conviction, the court's duty is to guide the proceedings with instructions based not on misapprehensions of the definition of a felony but on a proper determination of law substantiated in the record." *Id.* at 49. As previously stated, we find that the State provided the trial court with sufficient evidence to prove that Hornbostel's Florida convictions were felonies. The State entered into evidence several documents establishing that Hornbostel's Florida convictions were, in fact, felonies. Therefore, we find that *Cavendish* is distinguishable from the instant case.

trial court took judicial notice of the fact that the two prior unrelated convictions were felonies, and it instructed the jury as such. Thus, it should not be a surprise to Hornbostel that the jury came to a quick conclusion that he was an habitual offender. Furthermore, he has not demonstrated that a quick conclusion automatically means an incorrect conclusion. Therefore, without more, we are unable to find that there was an error at the habitual offender proceeding that was so prejudicial to the rights of Hornbostel as to make a fair trial impossible. *See id.*

Based on the foregoing, we conclude that Hornbostel was properly adjudged an habitual offender.

## II. *Voluntary Intoxication*

Next, Hornbostel argues that the trial court improperly instructed the jury that voluntary intoxication is not a defense. This court has held that jury instructions are within the discretion of the trial court and will not be reversed unless the instructions, when taken as a whole, misstate the law or mislead the jury. *Champlain v. State*, 717 N.E.2d 567, 569 (Ind.1999).

In *Melendez v. State*, 511 N.E.2d 454, 456–457 (Ind.1987), our supreme court held that:

> The law on the defense of involuntary intoxication was clarified in *Terry v. State*, Ind., 465 N.E.2d 1085 (1984). This Court held that "[a] defendant in Indiana can offer a defense of voluntary intoxication to any crime." *Id.* at 1088....
>
> Of course, voluntary intoxication differs from an affirmative defense, such as entrapment or necessity. An affirmative defense admits all the elements of the crime but proves circumstances which excuse the defendant from culpability. Voluntary intoxication, on the other hand, negates the essential element of intent. In this sense, "it is not

intoxication that is a defense, but rather that intoxication may be considered as would any other mental incapacity of such severe degree that it would preclude the ability to form intent." *Butrum v. State* (1984), Ind., 469 N.E.2d 1174, 1176.

However, Ind.Code § 35–41–3–5 provides:

> It is a defense that the person who engaged in the prohibited conduct did so while he was intoxicated, only if the intoxication resulted from the introduction of a substance into his body:
>
> (1) without his consent; or
>
> (2) when he did not know that the substance might cause intoxication.

■ Court's Instruction No. 22 is a verbatim recitation of Ind.Code § 35–41–3–5. Thus, it does not misstate the law. Furthermore, it is not apparent from the Record that the trial court told the jury that voluntary intoxication is not a defense. Rather, it simply gave Court's Instruction No. 22. While it is true that Hornbostel objected to Court's Instruction No. 22, the Record does not reflect counsel's reason for the objection. Moreover, there is no evidence that Hornbostel tendered, and the trial court rejected, an instruction maintaining that voluntary intoxication is a defense.

Based on the foregoing, we cannot find that the trial court abused its discretion when it gave Court's Instruction No. 22.

## III. *Sufficiency of the Evidence*

Next, Hornbostel argues that the State did not present sufficient evidence to support his conviction for murder. Specifically, Hornbostel argues that there was insufficient evidence that he was aware of a high probability that he would kill Sneed by choking him.

In reviewing sufficiency of the evidence claims, this court does not re-weigh the evidence or judge the credibility of the witnesses. *Mabbitt v. State,* 703 N.E.2d 698, 700 (Ind.Ct.App.1998). We consider only the evidence most favorable to the verdict, and the reasonable inferences therefrom, and will affirm if there is substantial evidence of probative value to support the conclusion of the trier of fact. *Id.* Reversal is only appropriate when reasonable persons would be unable to form inferences as to each material element of the offense. *Id.*

Ind.Code § 35–42–1–1(1) provides, in pertinent part, as follows:

A person who:

(1) knowingly or intentionally kills another human being;

 \* \* \*

commits murder, a felony.

The trial court instructed the jury that "[a] person engages in conduct 'knowingly' if, when he engages in the conduct there is a high probability that he is aware of his conduct." (Appellant's Appendix at 82). This is almost a verbatim recitation of the culpability statute, Ind.Code § 35–41–2–2(b).

At trial, Hornbostel explained to the jury that:

At that time he [Sneed] was saying don't worry about it. It will be all right [sic] and that and I was freaking out. I couldn't, you know, this is too freaky for me and, you know, and I was trying to get him off of me. And that's when I tried to choke him, trying to choke him to get off of me, you know.

 \* \* \*

Just trying to choke him to get to a point where, you know, he's going to let go of me. If he let go of me, he knows I was going to stop.

(R. 286–287).

Additionally, Dr. Mark LeVaughn (LeVaughn), the forensic pathologist for the Vanderburgh County Coroner's Office who performed the autopsy of Sneed, testified at trial. LeVaughn testified that:

The triatic injuries on Mr. Sneed consisted of bruising around the neck. He had abrasions or scrape marks on the right side of the forehead. He had a bruise on his left thigh and he also had what I call are pressure marks which correspond with what I was told before the autopsy that he was found kind of folded up in a fold away couch or bed and there was a pressure mark on his left side of his, left forehead, in this area, and on the back of his left knee consistent with something being up against that portion of his body for some period of time which I can't tell you the period of time but there was some objects pressing on the skin. The injury pattern that he had on his neck was, in my opinion, consistent with strangulation and also some type of massive crush injury to the neck. The eyes had hemorrhages that are indicated or that indicate a compression around the neck and multiple times of compression. Pressure, release, pressure, release and that's the type of hemorrhages he had in the neck that are very, in my opinion, characteristic of that type of traumatic injury. . . . The internal examination of the neck, the dissection of the muscles in the voice box area, showed massive amounts of hemorrhage. More than what I have seen in my experience with just a manual hand strangulation. The voice box itself or the larynx was crushed. . . . I think there was also, in addition to strangulation, there was some crush injury to the neck which in

my opinion is consistent with a stomp mark or some type of pressure from the shoe.

(R. 211–213). Moreover, when asked to compare this particular strangulation with the other hundred or so that he has examined, in terms of severity, LeVaughn stated, "[a]s far as I can recollect over the past fifteen years, this injury pattern and the amount of hemorrhage in the neck is one of the most severe that I have seen." (R. 219).

It is the jury's prerogative to weigh the credibility of witnesses and to weigh the evidence. *Stephenson v. State*, 742 N.E.2d 463, 499 (Ind.2001). This court will not reweigh the evidence or judge the credibility of the witnesses. *Mabbitt*, 703 N.E.2d at 700. With this in mind, it was for the jury to determine whether to believe Hornbostel's story that he was not choking Sneed to kill him, but, rather, to get Sneed to let go of him. There was significant evidence before the jury that Sneed had massive and brutal injuries, whereas Hornbostel had very few. Furthermore, there was evidence before the jury that Hornbostel may have intended to kill Sneed and then steal from him.

Consequently, we find that the jury could reasonably find that Hornbostel knowingly killed Sneed. *See* Ind.Code § 35–42–1–1(1). Therefore, we find that there is substantial evidence of probative value to support the conclusion of the trier of fact. *See Mabbitt*, 703 N.E.2d at 700.

### IV. *Sudden Heat*

 Hornbostel next argues that the State failed to rebut his prima facie showing that he killed Sneed while in a state of sudden heat. To obtain a conviction for murder, the State is under no obligation to negate the presence of sudden heat, because there is no implied element of the absence of sudden heat in the crime of murder. *Harris v. State*, 710 N.E.2d 186, 187 (Ind.1999). However, once a defendant places sudden heat into issue, the State then bears the burden of negating the presence of sudden heat beyond a reasonable doubt. *Id.* The presence or absence of sudden heat is a question to be resolved by the jury. *Patton v. State*, 668 N.E.2d 253, 254 (Ind.1996).

 In its Final Instructions, the trial court instructed the jury, with respect to the murder charge, on lesser included offenses. Court's Instruction No. 8 provided, in pertinent part, as follows: "[a] person who knowingly kills another human being while acting under sudden heat commits Voluntary Manslaughter, a Class B Felony." (Appellant's Appendix at 86). Court's Instruction No. 9 further instructed the jury, in pertinent part, that:

> In order for a killing, which would otherwise be murder, to be reduced to manslaughter, the killing must have been upon a sudden heat of passion, caused by sufficient provocation upon the part of the one killed, and the killing must have followed the provocation before there had been a reasonable opportunity for the passion to cool and there must have been a causal connection between the provocation, the passion, and the fatal act.

(Appellant's Appendix at 87).

While its true that Hornbostel testified that he only strangled Sneed because he "freaked out" when Sneed repeatedly made unwelcome sexual advances, there was evidence before the jury that Hornbostel may have intended to kill Sneed and then steal from him. (R. 283). Thus, there were two versions of the events that occurred on August 26, 2000. The jury was adequately instructed on the elements of murder, lesser included offenses, voluntary manslaughter and sudden heat.

Because the jury found Hornbostel guilty of murder and not voluntary manslaughter, it is apparent that the jury found that the State negated the presence of sudden heat beyond a reasonable doubt. *Harris,* 710 N.E.2d at 187. Therefore, we find that the State successfully rebutted Hornbostel's prima facie showing that he killed Sneed while in a state of sudden heat.

## V. *Admission of Evidence*

Next, Hornbostel argues that the trial court erred in admitting certain evidence over his objection. Specifically, Hornbostel argues that the trial court erred in admitting an unnecessarily gruesome autopsy photograph, a close-up of Sneed's bloodshot eyeball with the eyelids being held apart by surgical instruments. Hornbostel also argues that the trial court erred when it allowed the State to ask Detective Hands whether he believed various assertions made by Hornbostel.

 It is within the sound discretion of the trial court to admit or exclude evidence. *Hardiman v. State,* 726 N.E.2d 1201, 1203 (Ind.2000). This court will not reverse the trial court absent an abuse of that discretion. *Id.* A trial court abuses its discretion when its evidentiary ruling is clearly against the logic, facts and circumstances presented. *Id.*

### A. *Autopsy Photograph*

██ At trial, the State entered autopsy photographs of Sneed into evidence. When asked if he objected to the admission of the photographs, Hornbostel's counsel stated that he did object to their admission into evidence, because "the evidentiary value of the (inaudible) prejudices the jury." (R. 208). Hornbostel's objection was overruled and the photographs were admitted into evidence. When asked, "would these photographs help you to explain to the jury how you arrived at

the conclusion that you arrived at," Dr. LeVaughn stated, "I believe so, yes." (R. 209).

 Autopsy photographs are admissible if they provide relevant evidence, and their probative value is not substantially outweighed by their tendency to impassion the jury against the defendant. *Malone v. State,* 700 N.E.2d 780, 783 (Ind. 1998). When such photographs are used to illustrate the pathologist's testimony, the initial relevancy requirement has been satisfied. *Id.* The question then becomes one of balancing the probative value against the prejudicial effect, and a trial court's ruling on this issue will not be disturbed absent an abuse of discretion. *Id.*

Hornbostel focuses his argument on State's Exhibit 42, a close-up photograph of Sneed's bloodshot eyeball with the eyelids being held apart by surgical instruments. Hornbostel maintains that no explanation was given for why the photograph was necessary. We disagree. At trial, LeVaughn testified that these photographs would be helpful in explaining how he came to his various conclusions. Furthermore, LeVaughn used State's Exhibit 42 and 43 (an autopsy photograph of Sneed's upper torso, neck and head) to illustrate to the jury Sneed's injuries. LeVaughn testified that "the photographs depict the pattern of injury, the area, the amount of trauma and also the eye which indicates the neck compression and in my opinion, a cycle of compression and release." (R. 225).

We find that there was a clear explanation of why the autopsy photographs were necessary, as they were used to illustrate the pathologist's testimony. Thus, the initial relevancy requirement was satisfied. *See Malone,* 700 N.E.2d at 783. Hornbostel makes no further argument as to how

the probative value of State's Exhibit 42 was substantially outweighed by its prejudicial effect on the jury. Consequently, without more, we cannot find that the trial court abused its discretion in admitting the autopsy photographs into evidence.

### B. *Detective Hands' Testimony*

Hornbostel also argues that the trial court erred when it allowed the State to ask Detective Hands whether he believed various assertions made by Hornbostel. As previously stated, on redirect examination, Hands was asked "[d]id you believe Mr. Hornbostel when he said he didn't intend to kill Jeffrey Sneed, Andrew Sneed?" (R. 160). Hornbostel objected, stating that the question "invades the province of the jury." (R. 161). The trial court overruled the objection and allowed Hands to answer the question. This was the only question, in a series of approximately twelve questions where Hands was asked if he "believed" something that Hornbostel had told him, that Hornbostel objected. Because Hornbostel failed to object to the other eleven belief questions, we find that he has waived any objection to those questions. *See Angleton v. State*, 686 N.E.2d 803, 811 (Ind.1997), *reh'g denied*. Thus, we will only discuss the question to which Hornbostel actually objected.

Ind.Evidence Rule 704(b) provides that "[w]itnesses may not testify to opinions concerning intent, guilt, or innocence in a criminal case; the truth or falsity of allegations; whether a witness has testified truthfully; or legal conclusions." With this, we agree that the trial court erred in overruling Hornbostel's objection to the State's question as to whether Hands believed Hornbostel when he said that he did not intend to kill Sneed. Nonetheless, the error is harmless. "To be reversible, opinion testimony must prejudice the defendant." *Taylor v. State*, 689 N.E.2d 699, 706 (Ind.1997). Additionally,

when determining whether an error is harmless, "courts look to several factors, including the strength of the prosecution's case, the importance of the witness' testimony, whether the testimony was corroborated, the cross-examination that did occur, and whether the witness' testimony was repetitive." *Smith v. State*, 721 N.E.2d 213, 219 (Ind.1999).

Hornbostel maintained that he did not intend to kill Sneed. He insisted that he was trying to thwart Sneed's unwelcome sexual advances. Hornbostel stated that he was only choking Sneed to get him to let go of him, not to kill him. However, there was evidence that Hornbostel knew that Sneed was homosexual before he went home with him—he met Sneed at a gay bar. Furthermore, there was evidence that Hornbostel may have gone home with Sneed with the intention to kill him and then steal from him. The State's case did not rest on Hands' answer to the question posed on redirect examination. Consequently, we find that Hands' testimony was cumulative in light of all the other evidence presented at trial. Therefore, we find that the trial court's error in allowing Hands to testify, over Hornbostel's objection, did not prejudice Hornbostel. Thus, it was harmless. *See Smith*, 721 N.E.2d at 219; *Taylor*, 689 N.E.2d at 706.

### VI. *Sentencing*

Finally, Hornbostel argues that he was improperly sentenced. Specifically, Hornbostel argues that the trial court improperly enhanced his sentence with the use of two invalid aggravating factors: 1) he "literally killed Andrew [Sneed] with [his] bare hands," and 2) he "is in need of correctional or rehabilitative treatment that can best be provided by his commitment to a penal facility." (R. 456 & 458). Hornbostel also argues that the trial court improperly failed to recognize, as mitigating factors, that he acted under extreme

provocation and that there were other substantial grounds tending to excuse or justify the crime. Additionally, Hornbostel argues that his sentence is manifestly unreasonable.

### A. Aggravating Factors

Ind.Code § 35–38–1–7.1, in pertinent part, provides:

(a) In determining what sentence to impose for a crime, the court shall consider:

\* \* \*

(2) the nature and circumstances of the crime committed;

\* \* \*

(b) The court may consider the following factors as aggravating circumstances or as favoring imposing consecutive terms of imprisonment:

(1) The person has recently violated the conditions of any probation, parole, or pardon granted to the person.

(2) The person has a history of criminal or delinquent activity.

(3) The person is in need of correctional or rehabilitative treatment that can best be provided by commitment of the person to a penal facility.

(4) Imposition of a reduced sentence or suspension of the sentence and imposition of probation would depreciate the seriousness of the crime.

Additionally, in *Morgan v. State*, 675 N.E.2d 1067, 1073 (Ind.1996), our supreme court held that when a trial court imposes an enhanced sentence, the trial judge must find at least one aggravator. Furthermore, in *Isaacs v. State*, 673 N.E.2d 757, 765 (Ind.1996), our supreme court held that an enhanced sentence may be imposed when the only aggravating circumstance is the defendant's prior criminal history.

█ As stated above, the trial court specifically found Hornbostel's prior criminal history to be an aggravating circumstance. This, alone, was enough for the trial court to enhance Hornbostel's sentence. *See id.* Thus, it is unnecessary to further discuss the trial court's other considerations as to why it enhanced Hornbostel's sentence. However, we will discuss Hornbostel's claims to demonstrate why they are invalid.

█ "A factor constituting a material element of a crime cannot be considered an aggravating circumstance in determining sentence." *Johnson v. State*, 687 N.E.2d 345, 347 (Ind.1997). This is Hornbostel's basis for arguing that the trial court improperly relied on the fact that he used his bare hands to kill Sneed. While it is true that killing is an element of murder, using your bare hands is not an element of murder. We find that the trial court was focusing on Hornbostel using his bare hands to kill Sneed. As stated above, the trial court shall consider the nature and circumstances of the crime committed. *See* Ind.Code § 35–38–1–7.1(a)(2). The trial court did exactly this. In fact, prior to discussing its considerations, the trial court cited to Ind.Code § 35–38–1–7.1(a) and then discussed Hornbostel killing Sneed with his bare hands. Accordingly, we find that the trial court properly considered Hornbostel killing Sneed with his bare hands as part of the nature and circumstances of the crime committed.

█ We also find that the trial court properly found, as an aggravating circumstance, the fact that Hornbostel is in need of correctional or rehabilitative treatment that can best be provided by his commitment to a penal facility. In *Hollins v. State*, 679 N.E.2d 1305, 1308 (Ind.1997), our supreme court held that a "trial court must provide a specific or individualized statement of the reason why this defen-

dant was in need of correctional and rehabilitative treatment that could best be provided by a period of incarceration in a penal facility in excess of the presumptive sentence term." Additionally, in *Becker v. State*, 695 N.E.2d 968, 974 (Ind.Ct.App. 1998), this court held:

> when the record indicates that the trial court engaged in the evaluative processes but simply did not sufficiently articulate the reasons for the sentence imposed, then the reasons underlying the sentencing statement requirement have been fulfilled and there is no need for the reviewing court to remand for a more specific sentencing statement.

After it found, as an aggravating factor, that Hornbostel was in need of correctional or rehabilitative treatment, the trial court stated that "I believe in this case the evidence is that that could be established only by his commitment to a penal facility." (R. 458). Thus, it is true that the trial court failed to provide a specific statement as to the reason why Hornbostel was in need of correctional or rehabilitative treatment that could best be provided by commitment to a penal facility. However, it did engage in a lengthy and detailed discussion of considerations for sentencing and actual aggravating factors. Therefore, we find that the trial court's use of this aggravator was proper.

### B. *Mitigating Factors*

Hornbostel also argues that the trial court improperly failed to recognize, as mitigating factors, the fact that he was highly intoxicated and acting under strong provocation.

■ In *Penick v. State*, 659 N.E.2d 484, 488 (Ind.1995), our supreme court held:

> Although a court must consider the evidence of mitigating factors presented by a defendant, the finding of mitigating

circumstances lies within the sound discretion of the trial court. *Aguirre v. State* (1990), Ind., 552 N.E.2d 473, 476. The trial court is not obligated to make a finding of mitigating factors, nor explain why it has chosen not to do so. *Avance v. State* (1991), Ind., 567 N.E.2d 1149, 1154. Further, a "trial court is not obligated to accept a defendant's version of what constitutes mitigating circumstances." *Magers v. State* (1993), Ind., 621 N.E.2d 323, 324.

Additionally, "drinking is not to be considered a mitigating circumstance. Drinking goes only to the ability of the defendant to form intent." *Robinett v. State*, 563 N.E.2d 97, 102 (Ind.1990), *reh'g denied.*

■ At the sentencing hearing, the trial court specifically discussed mitigating factors and concluded that the evidence did not warrant or establish the existence of any. As stated above, drinking, or being highly intoxicated, is not a mitigating circumstance. *See id.* Thus, the trial court did not improperly fail to recognize it as such. Additionally, whether Hornbostel acted under strong provocation was hotly contested. There was evidence presented at trial that Hornbostel intended to kill Sneed and then steal from him. Therefore, the trial court did not improperly fail to recognize this assertion, made by Hornbostel, as a mitigating circumstance. *See Penick*, 659 N.E.2d at 488.

### C. *Manifestly Unreasonable*

Hornbostel also argues that his sentence is manifestly unreasonable. Ind.Appellate Rule 7(B) states: "[t]he Court shall not revise a sentence authorized by statute unless the sentence is manifestly unreasonable in light of the nature of the offense and the character of the offender."

Ind.Code § 35–50–2–3(a) provides:
A person who commits murder shall be imprisoned for a fixed term of fifty-five

(55) years, with not more than ten (10) years added for aggravating circumstances or not more than ten (10) years subtracted for mitigating circumstances; in addition, the person may be fined not more than ten thousand dollars ($10,000).

Ind.Code § 35–50–2–8(e) provides:

The court shall sentence a person found to be a habitual criminal to an additional fixed term that is not less than the presumptive sentence for the underlying offense nor more than three (3) times the presumptive sentence for the underlying offense. However, the additional sentence may not exceed thirty (30) years.

Ind.Code § 35–50–2–7(a) provides:

A person who commits a Class D felony shall be imprisoned for a fixed term of one and one-half (1 1/2) years, with not more than one and one-half (1 1/2) years added for aggravating circumstances or not more than one (1) year subtracted for mitigating circumstances. In addition, he may be fined not more than ten thousand dollars ($10,000).

As previously stated, the trial court sentenced Hornbostel to sixty (60) years on Count I, murder, enhanced by thirty years, calling for a ninety (90) year executed sentence on Count I. Thus, the trial court aggravated Hornbostel's murder sentence by five years and gave him the maximum additional sentence for an habitual offender. Additionally, Hornbostel was sentenced to three (3) years on Count II, theft, and to three (3) years on Count III, auto theft. Thus, the trial court aggravated Hornbostel's theft and auto theft sentences to the maximum allowable time. All counts were ordered to be served consecutively for a total sentence of ninety-six (96) years.

A maximum sentence permitted by law should be reserved for the very worst offenses and offenders. *Buchanan v. State,* 699 N.E.2d 655, 657 (Ind.1998). With this, Hornbostel claims that, because he "committed a rather run-of-the-mill, rather than particularly egregious, combination of murder and theft and is not among the worst offenders, his sentence should be revised downward around eighty-five (85) or so years." (Appellant's Brief at 54–55). We disagree and question Hornbostel's use of the phrase "run-of-the-mill" murder and theft combination. Hornbostel can be sure that Sneed's family and friends did not and do not find this crime to be "run-of-the-mill."

The trial court did not find the existence of any mitigating factors. However, the trial court properly found the existence of aggravating factors and, thus, enhanced Hornbostel's sentence. In light of the nature of the offense and the character of the offender, we do not find that Hornbostel's ninety-six (96) year sentence is manifestly unreasonable. *See* App.R. 7(B). Therefore, we find that the trial court properly sentenced Hornbostel.

### CONCLUSION

Based on the foregoing, we conclude that Hornbostel was properly convicted of murder. Additionally, we conclude that Hornbostel was properly adjudged an habitual offender. We also conclude that Hornbostel was properly sentenced.

Affirmed.

SHARPNACK, C.J., and NAJAM, J., concur.